Counsel Reddick. You may proceed. Thank you, Judge Ferris. Good morning, Your Honors. My name is Brad Reynolds. I represent Abercrombie & Fitch, the appellant in this action. This is a trademark infringement case. It was brought by Abercrombie & Fitch against Moose Creek to enjoin Moose Creek's newly designed Moose Marks that Moose Creek had displayed in a 2007 calendar and indicated it was going to be ready for launch in the spring of this year.  It was in a trademark infringement case, also one dealing with a dispute over Moose Marks by the two companies. And in order to facilitate the argument, I have provided the Court with two demonstrative exhibits, Abercrombie & Fitch Demonstrative No. 1 and No. 2. And those are captions of the respective cases. No. 1 is the earlier case in 2004, and that was one case brought by Moose Creek against Abercrombie. Moose Creek in that case was arguing that the Abercrombie silhouette moose that is displayed beside the name of Abercrombie on Demonstrative 1 would likely cause confusion with the several Moose Marks that Moose Creek had at that time, still has, and they're displayed beside the Moose Creek name. In the current action, we're dealing with Demonstrative No. 2, and Abercrombie is complaining because Moose Creek has redesigned its original marks, and the two silhouette and outline moose marks that are shown beside Moose Creek's names are the ones that are being challenged by Abercrombie as being likely to be confused with the two Abercrombie moose marks that are directly above it. There's a contract claim that involves the polo moose as a result of a settlement agreement that's also involved in this case. But the infringement case is involved with the silhouette and outline mooses in the second of the two demonstratives that I've provided this Court. The trial court below indicated that having decided initially there was no likelihood of confusion with regard to the Abercrombie and Fitch silhouette moose on Demonstrative No. 1 when compared and looked at against the Moose Creek several marks that are in Demonstrative No. 1. The trial court said that that decision that had been rendered in 2004 and affirmed by this Court was going to impact on this case and that to the extent that Abercrombie argued, as we did in the first case, no likelihood of confusion under the Sleekwood factors, that we were judicially estopped in this case from arguing that the marks that had been designed by Moose Creek in the interim did cause a likelihood of confusion with the Abercrombie marks. Your Honors, I don't think your opponent's going to seriously argue that you're bound, well, he might argue it, but I don't think seriously argue that you're bound when conditions have changed, when there have been some changes, and there have been some changes. There have been changes, Your Honor, and I believe that was one of the principal errors below, because I believe that the court below did not appreciate as fully as perhaps he could have or should have, that as a result of those changes, a judicial estoppel would have been, was inappropriate here. We have differences as to the marks, which is pretty clear if you look at the two demonstratives that I've handed, Your Honors. And the change principally is in the Moose Creek mark, that in this case, the silhouette and the outline moose that do not appear and were not involved in the prior case. There's also a change, a very significant change, because in the initial case, Moose Creek was arguing reverse confusion, and the whole focus of attention was on the purchasers of the Moose Creek apparel. Those purchasers were wholesalers. They were sophisticated purchasers. We argued they were sophisticated purchasers, and there was less likelihood of confusion if you had wholesale purchasers that you were dealing with. In this case we're concerned with the end user. And our argument here was that, contrary, we said the wholesalers would not, would exercise a greater degree of care. We came in here and we're arguing the end users who were younger and had purchased apparel are more likely to be confused, and we should not be judicially estopped from making that argument. So what do you think the bottom line should be so that when they come they can tell us why you're wrong? What would be the bottom line of the Court's opinion if we decided in your favor? We think that the Court should have preliminary enjoined the use of the new Moose Creek marks. But you don't expect us to do it, do you? Well, Your Honor, I think you can do it for a couple of reasons. One, I think that the district court made another significant error in that the district court failed to take into account post-purchase confusion. He simply applied judicial estoppel, the sleek craft factors, and looked at point of sale confusion. And when he moved to post-purchase confusion, the district court basically fundamentally misunderstood post-purchase confusion and said he determined that by looking at a purchaser who buys an Abercrombie shirt and a Moose Creek shirt and puts them in the same drawer and he wouldn't be confused. And the fact of the matter is post-purchase confusion deals with a non-purchaser. It's after the sale. And post-purchase confusion here, we submit, would lead anybody to the conclusion that if you look at demonstrative number two, the silhouette Mooses and the outline Mooses would likely be confused subsequent to the purchase by anybody who sees them on the garment. And the reason that we feel that this court can reach that conclusion is that as another basic error that occurred here, the district judge failed to compare the real-world Moose marks that are involved in this case. There was an imperfect photograph on the masthead of the catalog that was enlarged that was in the record. And there was also in the record the catalog. The district court said that the proper comparison here was to look at the silhouette and the outline Mooses as pictured in the 2007 catalog. But then instead of doing that comparison, he looked at the photograph of the masthead of the catalog and said that there were smudges that he saw on that photograph. He saw a reprographic light line that was on the photograph. And he said these did not show up on the Abercrombie Moose. Well, they didn't show up, but they wouldn't show up on the Moose Creek Moose that was on the garment. And the law is very clear in this circuit. In fact, in all circuits, Your Honor. Did you provide the district judge with the garment? Well, actually, the garment Did you provide it? Yes or no? No, Your Honor. We did not. The garment is not. At that time, Moose Creek represented the court that they had not gone into production with the garment. So the garment was not available. We did provide the court with an Abercrombie and Fitch garment. But what was before the court and was provided was the catalog. And the catalog had pictured in it the actual garments with the Moose logos on them. And had the judge gone to the catalog and those pictures and compared them, and they are taken in the record, and in demonstrative number two, those are depicted there as they appear in the record, and compared the silhouette Moose of Abercrombie and the silhouette Moose of Moose Creek and the same with the outline Moose, the judge would have seen that a real-world comparison demonstrates likely confusion certainly post-purchase. And we would maintain also demonstrates likely confusion point of sale. And the fact that we argue no likely confusion with respect to the first case should not in any way judicially stop us from arguing likely confusion with respect to the different marks in the second case. You know what? I think that we don't know. I can't tell you what the district or I can tell you what the record shows, but I can't tell you what went on in the court's mind. But one of the things that cuts against you is who had the mark first. Who had the mark first? In this case, Your Honor, Abercrombie and Fitch had the mark first. You had the Moose mark first? We had. Well, in the preceding case, Moose Creek had the several Moose marks in demonstrative number one first. No. And in the second case, the case that we're talking about today, the silhouette and outline Moose marks Abercrombie had first. We were the senior marks. The junior marks were the first. I think I understand what you're saying, and I know you're not attempting to mislead. But what happened, and I'm telling you, I don't know what went in the court's mind, but your company is a major company. Here comes somebody with a Moose. Your company decides it wants to use a Moose. And it did. And there were subtle similarities and differences. One, whether Moose had his legs crossed, and the other, whether Moose didn't have his legs crossed, all of those business. But I don't know what happened the second time around, because I think, I don't know what my colleagues are going to think. Three people have to vote. But I think it's clear that you can take a different position when something has changed. And what has changed was the marks. Now, although Moose had the Moose first, they now have a Moose that is far more similar to your Moose than the Moose they had at first when you tried the first case. But the court doesn't know how many, the volume of shirts and how much transaction luxury they have. They're back here with this Moose problem. And good gracious, what did they say the last time? That's what we're going to say this time. We have to sort it through. But when we sort it through, and I think it's before us and we'll have to do it, what will be the bottom line? What do we say when we sort it through? I think the bottom line, Your Honor, is essentially the Court has to determine in a trademark infringement case whether the junior mark, the later introduced mark, is sufficiently similar to cause a likelihood of confusion to either point-of-sale purchase or post-purchase, to a consumer who actually is out there in the market purchasing these shirts and shorts or to post-purchase somebody who sees them and someone other than the purchaser sees them on the back of the person who did it. And I think that what you need to do here and appropriately should be done is to look at the Moose marks that are involved in this case and determine whether or not when Moose Creek modified its first series of marks and brought out the two marks that we believe to be Abercrombie Moose marks, that what was going on there is they were moving their logo closer to ours so that the purchasers or people in the end-user-consumer category, when they looked at those marks, would be confused as to whether they were Abercrombie marks or not Abercrombie marks. And we think that what was going on here is they made these newly modified marks to be much more similar to Abercrombie so that their shirts would appear to be Abercrombie and Fitz shirts. And that is trademark infringement. That's what was going on, and we think that's what needs to be decided. And we asked for a preliminary injunction. We came to the Court quickly because we wanted to get the Court to enjoin this kind of a launch of marks that were, we would say, facsimile, I'll say strikingly similar to our marks, and were going to be put on the same kind of casual clothing that we have on, that we have our marks on, and then sold, and we believe be confusing to the end-user-consumers. Thank you, Your Honor. May it please the Court. I'm Tim Tuohy on behalf of Moose Creek, and I was counsel in both the 2004 case as well as in this case. I think what I've just heard Mr. Reynolds say is essentially that this Court should make a de novo analysis of the similarity of the marks and send this back with a preliminary injunction to the district court. Now, I think that that is not the standard under which this Court operates on a preliminary injunction motion. Certainly, if you look at the sports form case, which we cited, that this Court does not substitute its judgment for that of the district court. We have stated throughout this appeal and below that the marks have been changed from what they were in the previous case. We are not saying that absolutely every single thing is identical to the previous case. That would have been less interesting to be sure, and it's certainly not the case of what we're doing here. The marks were changed. And what the district court did here was not some sort of off-the-cuff or, you know, casual analysis. It took a look at the materials for it. The Court was very careful, very familiar with this case. Judge Matz is a fastidious individual when it comes to reviewing the evidence. Last time it went against us. This time it was on our favor. But he pointed out inconsistencies in the record and looked at the marks as they were presented by the plaintiffs in this case and made a determination that those marks were not similar in the way that Abercrombie was claiming to the marks, to Abercrombie's own marks. He may have done just what you're saying, but we know what he said. And what he said was, you took the position first time that there wouldn't be confusion, that these marks were not similar. You can't now come in and say they are, even though they're different marks. Isn't that just about what he did? No, I would disagree. He did that with certainty. Well, I hope that's true, because if he didn't, it would be over. Go ahead. Let's parse this out a little bit more finally. As to certain of the sleek craft factors, he found that judicial estoppel operated. As to the similarity of the marks, he could not do that and did not do that. He did a fresh examination of the marks. Plaintiffs don't like his examination. They don't like what his conclusion was. Well, it isn't because they don't like it. They say he's dead wrong. They say he's dead wrong, but they don't believe they point to imperfections which they themselves presented with the Court. I don't think that there's any debate that there is a difference. There are significant differences between the marks that the Court found existed and which you can see from the exhibit which they presented. And who made the changes? Our clients made the changes. The clients made the changes on the basis of their marks, on basis of the Moose Creek marks. The unrebutted evidence from the declarants that we had was that they took their previous marks, and they had a variety of marks, as you can see, some of which were silhouette marks, and made modifications to them. And you said they are your clients. My clients, too. And Abercrombie's argument, as I understand it, is this. We haven't changed our marks from the first lawsuit. We still have the same marks. But Moose Creek has changed this mark, and they brought their mark closer to being identical to ours. And, therefore, when the Court said you took a position before, and you can't take it now, the Court was wrong. Now you tell us what's wrong. Well, I think there's a couple of things that have to be considered there. First of all is there was a consent to use agreement, a settlement agreement in the first case, which allowed the parties to continue, obviously, to use their own marks, and prohibited the use of certain other marks. We went through the first case without a peep from Abercrombie and Fitch about this particular Polo Moose mark, which they claimed at the 11th hour in settlement negotiations was something that they were perturbed about and wanted to prohibit us from doing that. We refused to not put marks on our clothes, on the outside of clothes as a silhouette. And we did agree to a consent to use agreement, a contract that defined the party's ability to modify their marks and to use marks. You don't want to leave anything out, and we certainly aren't going to add anything. We just go with the record as it is before us. But isn't that different in who was purchasing what now as opposed to then? Well, this puts me in a very strange position, because in the first case, I argued very strenuously, of course, that we should look more broadly at who was purchasing the clothes, and that looking at retailers was not sufficient. And, in fact, if you go back to see what Abercrombie said in the first case, they said, although they talked about the general public purchasing as well, as to certain of the sleek craft factors, they said that the commercial impression of the goods and the marks on the goods were completely different as viewed from the ordinary consumer's point of view, not viewed from the retailer, the sophisticated retailer's point of view, because their goods appear in this very distinctive Abercrombie and Fitch setting with their own house marks in their own stores only, on their websites only. So it was not cut and dried in the first case that you looked, that there was no consideration given to the broader purchasing public. We said, quite strenuously, I think, that the distinction between retailers and non-purchasing and the general public purchasing was a false distinction because it ends up to be confused in the minds of the general public. Okay. But I will give you this. If we're saying that this is now a forward confusion case versus a reverse confusion case, that is a genuine difference between the two cases. Where does that get you? At the most, I think it broadens the scope of the customers that you look at, and I think that that goes, again, to the similarity of the marks. What's going to make an impact? Whether it's post-purchase confusion or its point of purchase confusion is, in fact, the similarity of the comments that Mr. Abercrombie made the last time around about the context in which those things are seen should bind them in this case because they made them, we relied upon them. Judicial estoppel doesn't require that the Court pick up on every single thing which was said before and rely on it absolutely. Under the New Hampshire v. Main case, in this circuit's Rosetto case, it can rely in part on that. There were factors that were argued regarding the general public in the first case by Abercrombie and Fitch that I think are absolutely applicable here. The crowded field doctrine, which deals with the strength of the mark, Abercrombie said in the first case that the scope of protection for any one moose design is necessarily limited. And then, citing this Court's Miss World case, they said in a crowded field, each member of the crowd, so to speak, each moose in the horde or the herd here of moose has as limited protection because it's relatively weak. So what I'm saying here on the judicial estoppel point is that Abercrombie really staked out a much broader territory than they would have you believe in the last case regarding the general consuming public, regarding the strength of the marks, and they now wish to sort of turn the clock back and say as if that hadn't happened. I give you that there have been changes that have occurred, and this is a forward confusion case versus a reverse confusion case. Now, I think that the Court's analysis of the similarity of the marks, which was not something that was subject to judicial estoppel, he did not say, as I read the Court's opinion, that because I analyzed the groups of moose that were involved in the last case and found that they weren't similar, now that you've changed your logo, I'm going to find that those are not similar, too. Instead, the Court, at the behest of the plaintiffs, did the comparison. The fact that the side-by-side comparison point, I think, is interesting because the last time around, Abercrombie said that the side-by-side comparison really took you to seeing what do the marks look like in the clothes in the distinctive Abercrombie and Fitchen environment. And they say if you look at them not side-by-side, but as they appear in the marketplace as ordinary purchasers, this is the words they used last time, ordinary purchasers shopping in the ordinary way, purchase the type of goods each represent, they're very different. So if we're expanding this to look at more ordinary purchasers, why aren't Abercrombie's statements in the previous case binding on them in the second case? And how can they now say that those purchasers, which they said, citing Second Amendment, were, that all purchasers of clothing were sophisticated, why don't those admissions work as well? Well, you know what the answer is to it. You heard a bit of it from Mr. Randalls. Before, we were talking about wholesalers buying and then reselling. So we were looking at how the wholesalers looked at the mark. Now, we're both in the marketplace with our shirts, and we're looking at how retailers look at them. That's what they said, and that's what you're going to have to deal with if you want to deal with what we're going to have to deal with. Well, I would suggest that you look at the Supplemental Expert excerpts of Record 363 to 364, because this is where it explains, where Abercrombie specifically explained that they were looking at ordinary purchasers and how they reacted to these marks in the marketplace. Their analysis last time was not restricted to retailers. As I read the reverse confusion versus the forward confusion cases, they've cited a case that's been recently come down, the M2 software case. In that case, if you read that opinion fairly carefully, it was, I think, a decision that was handed off between Judge Barrett and Judge Matz when Judge Barrett presumably left the bench. This was exactly the same group of purchasers that they were looking at in both the forward confusion cases and reverse confusion cases. I would say that Judge Matz's analysis last time was not restricted entirely to retailers, but also included. Now, at the most, I think, where this gets you is to remand back to the district court to consider more explicitly, perhaps, than he did, the differences between a reverse and a forward confusion case. I don't think this gives you this opens up the door to a complete and utter reversal. And it certainly, as I don't see that there is an abuse of discretion to warrant that. Just a moment about, just on post-purchase. Breyer. You can make whatever arguments you want. But you can kind of be content that courts on appeal don't like to make factual findings. They don't have to, and we don't like to do it. I can understand why. And there was a limited record even in the district court. We don't have it. We just don't know. One fact I'd like to get cleaned up, though, is the Polo Moose thing that's on. Yes. Was that in existence prior to the first case? It certainly was. And is that owned by Moose Creek, Inc.? Yes, it was owned by Moose Creek, Inc. But in the consent to use agreement, we agreed that we would not place that any longer on our clothing. In the first case, Abercrombie did not bring a counterclaim of any sort complaining about the use of that mark. But their counsel, their different counsel at that time, did want us to place a restriction upon this in the settlement agreement, and after some to-ing and fro-ing on that, which is in the record, we agreed that we would not use that moose any further. But it was not. It was a moose that we had used and was in our catalog. If there aren't any further questions from the court. Counsel. Yes. Counsel, I thought Judge Matz, in his oral decision, expressly noted the difference between a reverse confusion and forward confusion. So it seemed to me he wasn't going down the wrong trail on that issue. I agree. I think he did mention it. I'm, in a sense, probably conceding a little bit more than I would like to concede in the face of the argument that there should be a complete reversal in this because he got the facts wrong. But I would say two things about that. Yes, he did mention it. And secondly, does, you know, how would that change things? That would expand, arguably, the group of individuals that you're looking at who would be confused, in a way sort of similar to the post-purchase confusion about us. And there's enough in the record from what Judge Matz did on the sleek craft factors, which he went through one by one, to support an analysis regarding those general consumers, particularly on the similarity of the marks. So he didn't overlook it. You're quite right, Your Honor. Okay. Thank you, Your Honors. Thank you. We'll hear a rebuttal. I don't think we can. No. We'll be through in a second. Is there any time left? Is there time left? Yes. Yes. We'll hear a rebuttal. I'll just take a few minutes. I'm sorry, Your Honor. No, you have your time. I want to just say a couple of quick things. I'm not we are not suggesting that there's a failure to recognize reverse confusion and forward confusion. But the emphasis in the first case was on reverse confusion, the professional shoppers. In this case, it was end users. I think the important point to bring up here more than anything else is that post-purchase confusion was not considered in the first case with regard to the marks that are on demonstrative one. When we came to post-purchase confusion in this case, Judge Matz misunderstood it as being similar to point-of-sale confusion, the customer's confusion. And the point I would make is that that is fundamental error, that on post-purchase confusion, it's after the sale. And if you look at the marks that are involved here in the real world, the similarities would suggest quite strongly their likelihood of post-purchase confusion with regard to these marks. They are fundamentally different than the other marks. The other point I would make is that Judge Matz here made the wrong comparison. And I would direct your Court's attention to an excerpt of Records 587 and 588, where the record shows the shirts and the pictures of the shirts with the Moose logos on them juxtaposed side by side for each of the companies. Judge Matz did not make that comparison. He made a comparison from, and it's in the brief, an imperfect photograph that does not look like either the Moose Creek logos or the Abercrombie logos. You know what the difficulty is? You've got three minutes, and you can maybe help the Court. This ought not be a yo-yo. You know, you shouldn't have to keep trying this back and forth, back and forth, back and forth. And assuming that the Court isn't going to make a factual determination, then the probability of a remand looms a little larger. So if we were to remand, what would we say? Well, if you're to remand, Your Honors, I would say that the first thing I would say is that the court should not apply judicial estoppel with regard to the marks in this case as opposed to the marks in the other case. I would say, two, that the court should look at these marks in terms of not only point-of-sale confusion under Sleekcraft, but also post-purchase confusion. And I would say, third, that in doing his examination or comparison of marks, the court should look to the marks as they appear in the real world, the actual marks. It may well be, if we go back on remand, that Moose Creek will now be able to produce a shirt, and we can then show him the actual shirt in court and the Abercrombie actual shirt in court, and that would be the comparison. But those are the three elements of error that occurred here. And we also would say on the contract that we have that in our brief. But those are the three elements of error, that it should not be judicial estoppel. That would not be applicable. The post-purchase confusion should look at after-the-sale confusion of non-purchasers with regard to the marks. And then when you look to the similarity of the marks, you look at it in the real world with respect to the marks as they're embroidered on the shirts. Now, we aren't going to decide the case on this, but I'm just a little curious. I know why Moose Creek uses a moose. It's Moose Creek. I don't know why Abercrombie decided to use a moose on its shirt. It's not going to turn the case, but I'm just a little curious, because you're a big operation. You can use what you want. You know, we see polo player, the alligator, just a number of marks. And how did it happen that? Abercrombie started using the moose in, I think, around 2000, Your Honor. It was to appeal to a younger group of outdoors kind of customers, sporty customers. And they selected the moose, and they have marked it in the records. They've marketed it. They've put a lot of resources into it, and it has actually become a source identifier for Abercrombie. I'm satisfied you've used it now, but I just wondered how in the first place all this litigation might not have come about if instead of the moose they would have used the elephant or somebody else. Well, somebody probably then would have had an elephant out there and probably would have come after. But then you would have had the mark first. Here you've got the mark second. Well, in the first case, it was actually the question was raised as to the extent as to whether or not Abercrombie had looked at or at the moose that Moose Creek had or been influenced by the Moose Creek mark at all with respect to the selection and use of its mark. And it was established that had not been the case at all. I told you, we're not going to make a factual finding based on that. No, I understand that. I was just a little curious because I thought, well, you could use whatever you wanted to use and make it a standard because you had the resources to do it. And so here we are now, second time around with a moose. And if we remand, maybe the third time around with a moose. And that's why I think we ought to at least try to resolve it so that it doesn't keep bouncing back. And that's not just to your advantage. That's to your advantage, too. You could spend a lot of money bouncing around on this thing. But we've got what we've got, and court doesn't hesitate to decide what it must. So that's what we're going to do. Thank you, Your Honor. Thank you very much. Case just argued. Any further questions? Case just argued is submitted. The court for this session stands adjourned.
judges: Farris, Gould, Duffy